UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IDRIS TURNER,

                Petitioner,

v.

JEFFREY UTTECHT,

                Respondent.

Case No. C14-470 RAJ-BAT

**REPORT AND RECOMMENDATION**

Petitioner Idris Turner seeks 28 U.S.C. § 2254 habeas relief from his conviction by jury of first degree assault of a child.  Mr. Turner presents three grounds for relief in his petition, but they are essentially one claim -- that the trial court should have suppressed his confession because it was coerced after he waived his *Miranda* rights.

The Court recommends **DENYING** the claims as Mr. Turner has failed to demonstrate that the state-court adjudication of his claims was contrary to, or an unreasonable application of, established federal law, or was an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d)(1)–(2).  The Court also recommends **DENYING** the issuance of a certificate of appealability.

**BACKGROUND**

**A.**    **Statement of Facts**

The Washington Court of Appeals summarized the facts as follows:

REPORT AND RECOMMENDATION- 1

1    P.T. was born on April 11, 2006. Her mother, Trina Washington-Eastland (Washington) was 18 years old at the time and living with her foster parent, Afua Ndiaye.  Since she was an infant, P.T. had constipation problems and when she was about 16 months old, Washington began spanking her to encourage her to move her bowels.

In July 2007, Washington began dating Idris Turner.  Turner moved in with her and in February 2008, Washington was pregnant with Turner's child.  Washington's pregnancy was high risk and she was often confined to bed.  As a result, Washington temporarily relinquished full care and custody of P.T. to Ndiaye, who cared for P.T. primarily during the week between April and September 2008.

On July 10, 2008, while Ndiaye was out of town, Turner and P.T. were visiting Washington at the hospital.  A nurse saw Turner take P.T. over his lap and strike her forcefully on her lower back and backside while P.T. cried loudly.  The nurse reported the incident to Child Protective Services (CPS).  When Ndiaye returned a few days later and resumed custody of P.T., she noticed bruises on P.T.'s buttocks, hip, and lower back, which were not present before she left town.  A CPS investigator spoke with Ndaiye and Washington, and Ndaiye reported the bruises.  The investigator examined P.T., photographed the bruises, and opened a file, but did not take any action at that time.

Later that summer, unbeknownst to Washington, Turner began dating Courtney Douglas and within a week, he moved into Douglas' apartment in downtown Seattle.  A week later, Turner introduced Douglas to his "best friend," Joy Brannon.  Brannon then moved into Douglas' apartment along with Turner.  Turner also introduced Douglas to P.T., his "step-daughter," and explained that P.T.'s mother was pregnant and unable to care for P.T.

Turner and Brannon lived with Douglas in her apartment for about three weeks, until Douglas was evicted.  The three then moved to a condominium in Renton.  During this time, P.T. often stayed there with Turner.  Washington was confined to bed rest at this time due to the late stage of her pregnancy and Turner had primary responsibility for P care from approximately mid-September to mid-October 2008 and again in November 2008.

During this time, Turner became frustrated with P.T.'s constipation problem and lectured her daily about "pooping."  He grabbed her face if she did not seem attentive, leaving bruises on P.T.'s jaw line.  Turner then began whipping P.T. with a leather belt when she would not have a bowel movement.  He would also put P.T. in the bathtub and spray water in her face with a shower nozzle.

On one occasion, after lecturing P.T., Turner took her into the bathroom.  Douglas then heard two loud "smacks" and stood outside the bathroom door,

REPORT AND RECOMMENDATION- 2

listening to Turner speaking firmly to P.T.  When Douglas opened the door, she saw P.T. on the floor, in a fetal position, not making a sound.  Turner had a belt high above his head, ready to strike P.T. again.  When Douglas asked him what he was doing, he attacked Douglas and struck her repeatedly with the belt.  He then returned to P.T. and whipped her, beating her entire body.  Douglas was too scared of Turner to call the police.

Shortly after this incident, Brannon and Turner had a dispute in which Brannon struck Turner with a metal compact disk rack and attempted to stab him.  Turner had P.T. with him at the time, but fled, leaving P.T. with Douglas.  Douglas took P.T. to the West Seattle apartment of her friend Myel Jewell and Turner, Douglas, and P.T. ended up staying with Jewell from about November 21, 2008 through November 29, 2008.[1]

On the day before Thanksgiving, Jewell and Douglas heard Turner yelling and P.T. crying inside the bathroom.  When Douglas opened the door, Turner screamed at her.  She saw P.T. in the bathtub, naked, as Turner held the showerhead and sprayed water in her face.  P.T. gasped for air and appeared to Douglas as though she could not breathe.  Later, Douglas noticed that P.T.'s mouth was "messed up," and Turner told her she fell in the tub.

The next day, on Thanksgiving, P.T. had a big scarf tied around her head in a bow that covered her cheeks, ears, and part of her head.  Turner forced her to stand while she ate to teach her that "people won't do things for her."  Later that night, Jewell awoke to the sound of P.T. crying and gurgling coming from the bathroom.  She also heard what sounded like a body part bumping against the tub.  Turner came out of the bathroom and explained that P.T. had fallen but was okay.  P.T. whimpered.

The following day Jewell agreed to watch P.T. so Turner could visit Washington and the new baby.  P.T. had been asleep in Turner's arms and was bundled up in a jacket and hat that covered part of her face.  When Turner left, Jewell laid P.T. down and let her sleep.  Several hours later, Jewell became concerned because P.T. had slept all day and she had trouble waking her.  She then removed the hat and hood and saw bruises on P.T.'s face and a knot on her forehead.

When Douglas returned home from work, Jewell told her that something was wrong with P.T.  Turner then arrived home and Jewell told him to take her to the hospital.  Turner became very angry and insisted that P.T. was playing a game.  He tried to stand her up next to him and when she reached for his leg to brace herself from falling, he moved his leg and let her fall.  Turner then whipped her on her leg because he thought she was disobeying him.  He continued to demand that she stand, but she kept falling down.

REPORT AND RECOMMENDATION- 3

Turner then held P.T. in his arms and insisted that she was fine and was just asleep. P.T. then began having seizures and Douglas and Jewell began to rub ice on her to stop the seizures. They then removed P.T.'s clothing and saw that she was bruised all over her body, hair was missing from both sides of her head, and that there were cuts on her stomach from the belt whippings and finger marks on her arms.

Turner then said he could not believe he had done this to his baby and told Douglas and Jewell that the injuries were from him whipping and grabbing P.T. He then told P.T. to fight and be strong and said, "[O]h, my baby, I did this to you. I am so sorry. . . . I don't want to go to jail, I don't want to go to prison." He threatened to kill himself and everyone else. P.T. continued to have seizures, but no longer woke up or moaned. Jewell and Douglas repeatedly told Turner they needed to take P.T. to the hospital, but he refused.

The next morning Turner took P.T. to see Washington, who was still on bed rest. Turner said that P.T. was fine, but according to Jewell, P.T. was still unconscious when they left. When Washington saw P.T., she immediately knew that P.T. needed to be hospitalized and they took her to the emergency room.

At the emergency room, P.T. was unresponsive, was breathing abnormally, and had retinal hemorrhaging. Her CT (computed tomography) scan was abnormal, indicating possible traumatic brain injury. Her body was bruised all over and several areas were swollen, including her buttocks. She also had puncture like wounds to one leg. She was intubated and transferred to Harborview Medical Center in critical condition.

At Harborview, she was treated by Dr. Kenneth Feldman, an expert in pediatric child abuse. Feldman noted that P.T. had areas of skin that had been torn off, muscle damage, traumatic injuries to her scalp where she had hair loss, a burn mark on one hand, a torn retina in one eye, bleeding in both eyes, fresh blood in the normal fluid space around her brain and old fluid around her brain, which was indicative of previous brain trauma. According to Feldman, these injuries were likely the result of non-accidental trauma. Additionally, she was left blind in one eye and had impaired vision in the other. According to Dr. Jason Cheung, a pediatric ophthalmologist, it would take a severe force, not a seizure, to separate the layers of P.T.'s retina.

Turner was eventually arrested and interviewed by police detectives. He admitted to whipping P.T. with a belt during toilet training sessions. He also told police that on that Wednesday, he had hit P.T. with a belt while she was on the toilet and she fell off on to the floor. He said that she defecated while she was on the floor and then he put her in the bathtub. He also said that she had hit her head while he was whipping her and he noticed a knot or bump on her forehead, but that it was an accident.

REPORT AND RECOMMENDATION- 4

The State charged Turner with first degree assault of a child. At trial, Turner presented expert testimony from Dr. Lily Jung, a neurologist who reviewed P.T.'s medical history and noted that P.T. suffered a previous seizure in June 2006 and had a brain defect that predisposed her to have seizures. According to Jung, P.T. had a hole in her corpus collosom, a structure in her brain that sends signals from one hemisphere of the brain to the other. Jung further noted that P.T. was born with a sickle cell trait that predisposed her to clotting of the veins and testified that based on the CT scan done when she was brought to the hospital on November 29, 2008, P.T. had such a clot that was deep within her brain in a place where a clot was not likely to be a result of trauma. According to Jung, the trauma from increased brain pressure, which had been caused by the blood clot, damaged P.T.'s optic nerve and caused her to lose her sight.

The jury found Turner guilty as charged. The trial court imposed a standard range sentence of 147 months, with 24 to 36 months' community custody. Turner appeals.

[1] [State court's footnote] The baby was born on November 20, 2008.

Dkt. 16, Exhibit 6, Unpublished Opinion, pp. 1-7; *State v. Turner*, 164 Wash. App. 1031 (2011).

**B.    State Procedural History**

Mr. Turner appealed his conviction through counsel to the Washington Court of Appeals. Dkt. 16, Exhibit 4. The court denied his appeal in an unpublished opinion. *Id.,* Exhibit 6. Mr. Turner did not petition for review in the state's highest court. The Washington Court of Appeals issued its mandate on December 9, 2011. *Id.,* Exhibit 7.

Mr. Turner then filed a pro se personal restraint petition in the Washington Court of Appeals. *Id.,* Exhibit 8. The court dismissed the petition. *Id.,* Exhibit 11. Mr. Turner moved for discretionary review in the Washington Supreme Court. *Id.,* Exhibit 12. The court denied review in a ruling by the commissioner. *Id.,* Exhibit 3. Mr. Turner moved to modify the ruling. *Id.,* Exhibit 13. The court denied the motion without comment on February 5, 2014. *Id.,* Exhibit 14. The Washington Court of Appeals issued a certificate of finality on February 21, 2014. *Id.,* Exhibit 15.

//

REPORT AND RECOMMENDATION- 5

# EVIDENTIARY HEARING

The decision to hold a hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen v. Pinholster*, ---U.S.---, 131 S.Ct. 1388 (2011). A hearing is not required if the allegations would not entitle petitioner to relief under 28 U.S.C. § 2254(d). *Landrigan,* 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*; *see also Cullen,* 131 S. Ct. 1388 (2011). The Court finds it unnecessary to hold an evidentiary hearing because Mr. Turner's claims may be resolved on the existing state court record.

# DISCUSSION

Mr. Turner raised three separate grounds for relief in his petition, all based on his contention that the trial court should have suppressed as coerced, statements he made after he waived his *Miranda* rights. He contends that the statements were coerced because the interviewing detective threatened him with a charge of attempted murder and told him he would not be able to see Washington or his children anymore.

The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege applies in the context of custodial interrogations, *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), and is binding on the states, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). In *Miranda*, the Supreme Court identified

certain procedural safeguards which must precede an in-custody interrogation. The police must advise a person taken into custody, or deprived of freedom in any significant way, of his right to remain silent and his right to the presence of an attorney during questioning. *Id*. at 444. An individual may waive these rights if the waiver is made voluntarily, knowingly, and intelligently. *Id*.

A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and is knowing and intelligent if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A waiver may be express or implied, and its existence is determined based on the particular facts and circumstances in the case. *North Carolina v. Butler*, 441 U.S. 369, 373–75 (1979). "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (internal quotation and citations omitted).

Likewise, the statement a suspect makes after he waives his *Miranda* rights must be voluntary to be admissible. A voluntary statement is one that is the product of a rational intellect and free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). No one factor is determinative. Instead, the "totality of the circumstances" must be considered. *Crane v. Kentucky*, 476 U.S. 683 (1986). This includes both the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

A state court's subsidiary factual determinations underlying the issue of voluntariness are entitled to a presumption of correctness and its conclusions entitled to great weight. *Miller v.*

REPORT AND RECOMMENDATION- 7

1  *Fenton*, 474 U.S. 104, 112 (1985).  However, the ultimate issue of voluntariness raises a legal

2  question requiring independent federal determination.  *Id*.

3        In this case, the trial court held a CrR 3.5 hearing on the admissibility of statements, both

4  oral and written, made by Mr. Turner during the December 1, 2008 custodial interrogation.  The

5  trial judge found that after the officer arrested Mr. Turner at Sea-Tac airport on December 1,

6  2008, he advised Mr. Turner of his right to remain silent and his right to an attorney.  Dkt. 16,

7  Exhibit 9, at Appendix E (Finding of Fact 11).  That same day, a Renton police officer took

8  custody of Mr. Turner and advised Mr. Turner of his *Miranda* rights.  Mr. Turner acknowledged

9  that he understood his rights. The officer did not ask Mr. Turner any questions before he booked

10  Mr. Turner into the Renton city jail.  *Id.,* Exhibit 9, Appendix E (Finding of Fact 12).

11        Later that same day, Renton police detectives Montemayor and Barfield brought Mr.

12  Turner to an interview room in the Renton Police Department.  Detective Montemayor advised

13  Mr. Turner again of his *Miranda* rights.  *Id.,* Exhibit 16, Verbatim Report of Proceedings,

14  February 9, 2010, pp. 30-31, 90-91.  Mr. Turner again acknowledged and waived his rights.  *Id*.

15  The two-hour interview was recorded.  *Id.,* Exhibit 9, Appendix E (Finding of Fact 13).

16        A few hours later that same day, Detective Barfield spoke to Mr. Turner in an interview

17  room at the jail.  *Id.,* Exhibit 16, at 93.  Detective Barfield advised Mr. Turner of his *Miranda*

18  rights again.  *Id*. at 94.  Mr. Turner acknowledged in writing that he understood and waived his

19  rights.  Mr. Turner then provided a written statement.  *Id.,* Exhibit 9, Appendix E (Finding of

20  Fact 14).

21        Mr. Turner testified at the CrR 3.5 hearing that he provided the recorded and written

22  statements because Detective Barfield threatened to charge him with attempted murder and said

23  he would not let him see Washington or his children anymore.  *Id.,* Exhibit 17, Verbatim Report

REPORT AND RECOMMENDATION- 8

of Proceedings, February 10, 2010, pp. 81-82.  Detective Barfield testified that he had not threatened Mr. Turner.  *Id.,* Exhibit 16, at 130.  Both detectives testified that no threats or promises were made to Mr. Turner during the prior interviews.  *Id.,* Exhibit 16, pp. 33, 92.  The trial court found Mr. Turner's testimony regarding Detective Barfield's alleged threats "not credible."  *Id.,* Exhibit 9, Appendix E (Finding of Fact 15).

Mr. Turner further testified that Detective Barfield had not advised him of his *Miranda* rights before the written statement and that he signed the written waiver of rights form only when Detective Barfield ordered him to after the interview.  *Id.,* Exhibit 17, pp. 82-84.  This was contrary to Detective Barfield's description of the event.  *Id.,* Exhibit 16, pp. 93-94.  The trial court found Mr. Turner's testimony regarding Detective Barfield's alleged failure to read his *Miranda* rights "not credible."  *Id.,* Exhibit 9, Appendix E (Finding of Fact 15).

On appeal, the state court rejected Mr. Turner's claim that the trial court should have suppressed his statements:

> Mr. Turner next contends that the trial court should have suppressed as coerced statements he made after he waived his *Miranda* rights.   Mr. Turner claims specifically that the interviewing detective threatened him. He made the same claim at the CrR 3.5 hearing before trial.  The trial court listened to his testimony and that of the detective, and it did not find Mr. Turner credible.  Mr. Turner fails to show that the trial court's findings were unsupported by substantial evidence or that the court's conclusions are unsupported by the findings. *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

Dkt. 16, Exhibit 3, pp. 3-4.

The state court's fact-finding on this issue is presumed correct.  While Mr. Turner insists on the viability of his own interpretation of the evidence, he fails to demonstrate that the state court's determination as to the credibility of the witness testimony or the ultimate decision was in any respect unreasonable.  Therefore, his claims should be denied.

//

REPORT AND RECOMMENDATION- 9

## CERTIFICATE OF APPEALABILITY

If the district court adopts the Report and Recommendation, it must determine whether a certificate of appealability ("COA") should issue. Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A COA may be issued only where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Turner-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The Court recommends that Mr. Turner not be issued a COA. No jurist of reason could disagree with this Court's evaluation of his habeas claims or would conclude that the issues presented deserve encouragement to proceed further. Mr. Turner should address whether a COA should issue in his written objections, if any, to this Report and Recommendation.

## CONCLUSION

The Court recommends **DENYING** Mr. Turner's habeas petition on the merits without an evidentiary hearing, and **DENYING** the issuance of a certificate of appealability.

Any objections to this Recommendation must be filed and served upon all parties no later than Monday, **August 25, 2014.** The Clerk should note the matter for Wednesday, **August 27, 2014**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the

1 response is due.  Objections and responses shall not exceed twelve (12) pages.  The failure to
2 timely object may affect the right to appeal.
3       DATED this __4th__ day of August, 2014.

                                       /s/_____
                                       BRIAN A. TSUCHIDA
                                       United States Magistrate Judge

REPORT AND RECOMMENDATION- 11